**Terry Ann CHAMBERS et al., Appellants,**

v.

**IREDELL COUNTY BOARD OF EDU-
CATION, a public body corporate of
Iredell County, North Carolina, Appel-
lee.**

**No. 14243.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 4, 1970.

Decided Feb. 27, 1970.

James E. Lanning and J. LeVonne Chambers, Charlotte, N.C. (James E. Ferguson, II, and Adam Stein, Chambers, Stein, Ferguson & Lanning, Charlotte, N.C., Conrad O. Pearson, Durham, N.C., Jack Greenberg, James M. Nabrit, III, and Norman Chachkin, New York City, on brief), for appellants.

Jay F. Frank and Frederick G. Chamblee, Statesville, N.C. (Marcus L. Nash, and Chamblee, Nash & Frank, Statesville, N.C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER, CRAVEN and BUTZNER, Circuit Judges, sitting en banc.

CRAVEN, Circuit Judge:

The question presented by this school case is whether Iredell County has established a unitary school system. We think that a unitary system has been substantially achieved, and affirm the decision of the district court.

The situation in the Iredell County school system is as follows: There are 18 schools in the system. All of these schools, except Unity Elementary School, are fully integrated at present. There are 9,647 students in the system of which 1,802 (23 percent) are black and 7,845 (77 percent) are white. The system

operated under HEW approved freedom-of-choice plans from 1964 through the 1967–68 school year. In 1968–69 the school board adopted an approved zoning and freedom-of-choice plan. For 1969–70 the board has implemented a pure zoning plan that also was approved by HEW. The degree of integration achieved is demonstrated by an examination of the current racial structures of the various schools in the system.[1] The faculties are integrated in a ratio approximating the racial ratio among students in each school. No qualified black teacher applicant has been denied a job by the Board of Education or its staff, and there is no proof in the record of any discrimination in teacher employment. For 1969–70, all black teacher applicants were hired except one who was objectively unqualified and who applied after all of the available positions had been filled. Black teachers are employed throughout the system in approximately the same ratio to white teachers as black students to white students.

There is only one flaw in the unitary system adopted and already implemented by the school board: Unity School remains all black with 285 students.[2] Thus 1,517 black students have been fully integrated (84.2 percent) while 285 black students (15.8 percent) remain in an all-black school. The district judge found that the school board's decision to operate Unity School as an all-black school for the 1969–70 school year only was not racially motivated, and credited the explanation of the school board. Unity will be replaced by New East Elementary School, which is already well under con-

1.

| SCHOOL | GRADES | 1969–70 TEACHERS | | 1969–70 STUDENTS | | TOTAL | CAPACITY | TOTAL | 1970–71 STUDENTS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | N | W | N | W | | | | N | W |
| Amity | 1–6 | 3 | 7 | 101 | 168 | 269 | 450 | 250 | 120 | 130 |
| Brawley | 1–6 | 1 | 5 | 16 | 140 | 156 | 210 | 155 | 10 | 145 |
| Celeste-Henkel | 1–8 | 2 | 19 | 70 | 508 | 578 | 650 | 572 | 70 | 502 |
| Central | 1–8 | 1 | 14 | 48 | 373 | 421 | 575 | 445 | 45 | 400 |
| Cool Springs | 1–8 | 2 | 15 | 70 | 397 | 467 | 700 | 307 | 70 | 237 |
| East | 1–6 | | | | | | | 760 | 285 | 475 |
| Ebenezer | 1–6 | 0 | 9 | 20 | 239 | 259 | 270 | 260 | 14 | 246 |
| Harmony | 1–8 | 5 | 20 | 206 | 547 | 753 | 700 | 630 | 210 | 420 |
| Monticello | 1–8 | 2 | 22 | 74 | 584 | 658 | 600 | 630 | 50 | 580 |
| Mt. Mourne | 1–6 | 1 | 9 | 30 | 245 | 275 | 300 | 250 | 23 | 227 |
| North Iredell | 9–12 | 9 | 48 | 245 | 1055 | 1300 | 1200 | 1295 | 260 | 1035 |
| Scotts | 1–8 | 2 | 9 | 50 | 272 | 322 | 550 | 330 | 48 | 282 |
| Sharon | 1–6 | 1 | 7 | 15 | 210 | 225 | 240 | 211 | 18 | 193 |
| Shepard | 1–6 | 2 | 8 | 62 | 213 | 275 | 240 | 300 | 86 | 214 |
| South Iredell | 9–12 | 7 | 52 | 213 | 1203 | 1416 | 1300 | 1335 | 208 | 1127 |
| Troutman | 1–8 | 5 | 36 | 189 | 1010 | 1199 | 1400 | 1150 | 163 | 987 |
| Union Grove | 1–8 | 1 | 13 | 28 | 351 | 379 | 650 | 388 | 26 | 362 |
| Unity | 1–8 | 6 | 4 | 285 | 0 | 285 | 780 | CLOSED | | |
| Wayside | 1–6 | 2 | 12 | 80 | 333 | 413 | 330 | 235 | 72 | 163 |

2. This fact leads appellants to contend that the question before us is not whether a unitary system has been effected but whether we may permit delay in achieving it until September 1970. So framed, the answer is obvious. We have read Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed. 2d 19 (1969), and Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), to mean that we no longer have authority to permit, regardless of the circumstances, delay in implementing a unitary system. Whittenberg v. School District of Greenville County, 424 F.2d 195 (4th Cir., Jan. 26, 1970) (Petition for rehearing denied) ; Stanley v. Darlington County School District, 424 F.2d 195 (4th Cir., Jan. 26, 1970) ; Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4th Cir., Dec. 2, 1969).

struction and will be ready for occupancy by September 1970. East will absorb Unity's 285 black students and a part of the students from three other elementary schools: Cool Springs, Ebenezer and Wayside. The result in September 1970 will be a new integrated school (East) with approximately 285 blacks and 475 whites.

The district judge found that the closing of Unity was not racially motivated but was instead based on these considerations: (1) Unity is only 200 yards from the Statesville city limits, is adjacent to a scrap metal salvage yard, and is located on an inadequately small site (12 acres); (2) six of the 26 rooms at Unity are of obsolete wooden construction and are not fireproof; (3) Unity is not well situated relative to major thoroughfares; (4) a new school is needed to serve an expanding suburban population growth. It is urged upon us that the finding of the district judge is clearly erroneous. Appellants allege that the decision to close Unity was racially motivated because it arose out of a disinclination to put white pupils into a previously all-black school. This contention is not persuasive in light of the fact that the school board has already integrated Amity School, which was previously all-black and is now two-thirds white. There appears to have been no pattern of simply closing black schools because they have been black.

More difficult to justify than the closing of Unity is the failure of the Board of Education to "pair" it with Cool Springs, Ebenezer and Wayside Schools for the 1969–70 school year. Again the district judge credited the noninvidious explanation of the board. Unity was not allowed to remain all black during the last year of its operation in order to perpetuate one or more all-white schools. Wayside and Cool Springs are "racially balanced," i. e., the racial ratio among their students approximates that among all the students in the system, and Ebenezer has about half as many blacks as would be necessary for racial "balance." Ebenezer and Wayside are overcrowded and could not accommodate students from Unity. Although Cool Springs is operating at less than full capacity, it is located ten miles from Unity and almost that far from Ebenezer and Wayside. Moving white students from these schools to Unity, as suggested by appellants, could result in more racial mixing, but not necessarily in proportion to the racial mix in the entire school population. Unity's physical shortcomings have been described. Whether the Board of Education was motivated by valid educational considerations or by racial bias was an inference to be drawn from the facts by the district judge. In the context of the obvious good faith of the board and its effectiveness in otherwise completely disestablishing the former dual school system, we cannot say his decision was clearly erroneous.

It is true that absent reasonable effectiveness in disestablishing a segregated school system good intentions are of no avail. But here, in contrast to other cases we distinguish below, a remarkable degree of integration is now an accomplished fact. In all of the following cases, the challenge to the proposed plan of desegregation was directed to the inefficacy of freedom of choice.[3] In Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4th Cir., Dec. 2, 1969), 64 percent of the black students in grades one through six remained in a segregated situation. In Thompson v.

---

3. In some instances, e. g., Statesville and Durham County, zoning had accomplished integration for part of the system but freedom of choice remained ineffective as to the rest.

Durham County Board of Education, 418 F.2d 1040 (4th Cir., Dec. 2, 1969), 86.4 percent of the black students in grades one through six remained in four all-black schools. In Ziglar v. Reidsville Board of Education, 418 F.2d 1040 (4th Cir., Dec. 2, 1969), 50 percent of the black children in grades one through five attended an all-black elementary school. In Tucker v. County School Bd. of Amherst County, 418 F.2d 1040 (4th Cir., Dec. 2, 1969), 76 percent of the black students in grades one through seven attended overwhelmingly black schools. In Traynum v. County School Board of Halifax County, 418 F.2d 1040 (4th Cir., Dec. 2, 1969), 93 percent of the blacks in grades eight through 12 attended an all-black school. In Stanley v. Darlington County School District, 424 F.2d 195 (4th Cir., Jan. 26, 1970), only seven percent of all black students in the system attended school with white students. In Whittenberg v. Greenville County School District, 424 F.2d 195 (4th Cir., Jan. 26, 1970), only 33 percent of all blacks attended integrated schools.

We think it also significant that in none of the cases that have previously come before us has there been an HEW approved terminal plan for integration actually implemented and put into operation. Furthermore, Iredell's terminal plan was adopted without prodding from the courts. That the Iredell County Board of Education has been responsible and conscientious in its efforts to achieve a unitary system is made plain by a letter inserted in the record from the Department of Health, Education and Welfare, Office for Civil Rights, set out in the margin.[4] Contained in the letter is this sentence: "You [Superintendent of the Iredell County Schools], your school board, and your staff are to be commended for the leadership you have shown in meeting the provisions of Title VI of the Civil Rights Act of 1964." We agree. Indeed, we think it doubtful that many school systems have achieved a higher degree of integration than presently prevails in Iredell County. The test is whether a given plan "promises realistically to

4. "Jan. 28, 1970
"Mr. T. Ray Gibbs
Superintendent
Iredell County Schools
Box 709
Statesville, North Carolina 28677
"Dear Mr. Gibbs:
"Thank you for the cooperation extended to Mr. N. E. King of my staff during his visit to your administrative unit on January 22, 1970.
"His report indicates that the schools of Iredell County are currently being desegregated in accordance with the plan for desegregation submitted by you to the Office for Civil Rights on August 8, 1969, and approved on August 19, 1969, by Dr. Lloyd R. Henderson, Education Branch Chief, Office for Civil Rights in Washington. The plan commits your administrative unit to total desegregation of its schools by the opening of the 1970–71 school term and to certain interim desegregation measures during the 1969–70 school term.
"Mr. King reports that the administrative unit remains committed to the terminal date of 1970 and has met its responsibilities for carrying out the specified interim measures. You, your school board, and your staff are to be commended for the leadership you have shown in meeting the provisions of Title VI of the Civil Rights Act of 1964.
"Mr. King also reports that the future status of the principal at Unity School is uncertain when Unity is merged into the new elementary school now being built. Please be advised that you must weigh the qualifications of all of your principals objectively as to education, experience, professional competence, and seniority when one is to be selected for a new school. Race may not be considered in promotion, demotion, or reduction in staff. The same standards apply to teachers when a school is phased out.
"If you encounter any problems which will affect the terminal date, please bring them to our attention promptly.
"Sincerely yours,
"Eloise Severinson, Ph. D.
"Regional Civil Rights Director"

work, and promises realistically to work *now.*" Green v. County School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). We think this plan works sufficiently well *now* to deserve the label of a unitary system.

We decline to order the integration of Unity School now, refuse to enjoin the construction of East Elementary School, and find no basis for issuance of an injunction against discriminatory hiring and administrative practices.

Affirmed.

SOBELOFF and WINTER, Circuit Judges (dissenting):

In refusing to order the integration of Unity School the majority's thesis is essentially that, since defendant has achieved substantial realization of a unitary school system, it should be rewarded for its good faith efforts to date by not requiring it *now* to do that which is presently feasible and presently required to bring it into greater compliance with the decisions of the Supreme Court and of this Court. This reasoning we emphatically reject. We dissent from each link in its chain.

Defendant's legal obligation to achieve a unitary system arose in 1954 with the decision in Brown I (Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873), and its duty to proceed to that goal arose in 1955 with the advent of Brown II (Brown v. Board of Ed. of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083). It did not begin to meet this obligation until 1964, when it instituted a freedom of choice plan. The majority concludes that, as a result of its efforts to date, Iredell County's school system presently has "only one flaw in the unitary system adopted and already implemented." The facts do not bear this out. Of the total school population of 9,647 students no less than 1,424— the 285 in Unity and 1,139 in Cool Springs, Ebenezer and Wayside—are attending grossly segregated schools. The black pupils are in totally black Unity School and a vastly disproportionate number of whites are in the three schools which the plaintiffs asked the Board to pair with Unity.[1] This represents more than one-seventh of the total school population—no inconsiderable flaw, but a major defect. Obviously, the millenium which the majority envisions is not at hand in Iredell County.

The majority frankly recognizes that the Board's failure to pair Unity with Cool Springs, Ebenezer and Wayside Schools is "more difficult to justify than * * * [its] closing," yet attempts to justify this failure by advancing the theory that "moving white students of these three schools to Unity, as suggested by appellants, could result in more racial mixing, but not necessarily in proportion to the racial mix in the entire school population." This is an astounding line of reasoning.

Ebenezer's ratio of white students to black is approximately 12 to 1, Wayside's is 4 to 1, and Cool Springs' 5.7 to 1, while the ratio for the entire system is 3 white to 1 black. It seems to us plain enough that moving white students from these schools to Unity, which is being used below its capacity, would achieve a better

---

1. While the relief asked in the present suit focuses upon Unity School, it is important to note the racial imbalance that will persist in the system. In *Brawley* the Board projects for next year 10 black and 145 white; in *Celeste Henkel* 70 black and 502 white; in *Central* 45 black and 400 white; in *Ebenezer* 14 black and 246 white; in *Monticello* 50 black and 580 white; in *Mt. Mourne* 23 black and 227 white; in *Scotts* 48 black and 282 white; in *Sharon* 18 black and 193 white; and *Union Grove* 26 black and 362 white. These figures eloquently attest the Board's racial orientation, both past and present.

ratio in Unity and in these three schools. Depending upon the number moved to Unity, the racial makeup of the others can be made to conform more closely to the ratio in the total school population and some redress of the intolerable all black enrollment at Unity achieved.

Despite the factors adverse to the retention of Unity as a permanent part of the system, the record shows that it has available, acceptable, unused capacity. Instead of desegregating Unity, as it was constitutionally obligated to do, the Board has taken extreme affirmative steps to avoid assigning white students to Unity, an all black school in a black neighborhood. White students are actually being bussed past the undercapacity Unity School a distance of four miles to the overcrowded Wayside School.[2]

The Board's insistence upon retention of Unity as an all black school for this year is prompted by nothing we perceive except reluctance to desegregate,[3] and even if the Board's achievement in other parts of the system met constitutional requirements, it is clearly in default in this respect.

All of this leads us to conclude that the mandate "to eliminate dual school systems *at once* and to operate *now* and hereafter unitary schools" (emphasis supplied), announced in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19

(1969), reaffirmed in Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), and heretofore applied by us in Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4 Cir. 1969), and Stanley v. Darlington County School District, 424 F.2d 195 (4 Cir. 1970), is being violated. "Now" and "at once" are untempered by consideration of good faith. Those directions make the degree of accomplishment irrelevant. The only issue is what has not been done and what can be done now.[4] Our answer would be to order the desegregation of Unity School forthwith by pairing it with Cool Springs, Ebenezer and Wayside, or by any other acceptable method.

Finally, we dissent from the majority's denial of relief with regard to discrimination in teacher employment. The majority declares that "there is no proof in the record of any discrimination in teacher employment." On the contrary, although the HEW-approved plan of compliance provided that all employment and assignment of teachers was to be made without consideration of race, there was no faculty desegregation in 1965–66 and 1966–67. Some non-racial assignments were made in the ensuing years. However, the School Superintendent revealed that before the opening of the present school year, HEW determined the Board to be in non-compliance because it "had not adequately desegregated [the] faculty" and directed

---

2. We were advised at oral argument that in order to accommodate the *Wayside* overflow the Board went to the expense of acquiring mobile classrooms, which had recently been put into operation.

3. Indeed, Board member Brown testified frankly that, in his opinion, Unity will be closed under the plan for the future because "it's in a black community." This bald statement also makes it most difficult to accept the district judge's conclusion, now blessed by the majority, that the retention of Unity for 1969–70 and its closing thereafter were not racially motivated.

4. While the majority pays lip service to Alexander v. Holmes, 396 U.S. 19, 90 S.Ct. 29 (1969), and Carter v. West Feliciana, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), and purportedly recognizes its lack of authority to delay implementing a unitary system "regardless of the circumstances," it nevertheless sanctions the delay until next fall allowed by the district judge last November after the Supreme Court's decision in *Alexander*.

the Board to assign white teachers to Unity. Moreover, the testimony of the Assistant Superintendent of Schools charged with the hiring and assignment of teachers makes it clear that black teachers were hired only "to fill * * * Negro vacancies." The refusal of our Court, in the face of this record, to grant a preventive injunction against discriminatory hiring and administrative practices is without warrant. *Cf.*, North Carolina Teachers Association v. Asheboro City Bd. of Ed., 393 F.2d 736 (4 Cir. 1968); Wall v. Stanly County Board of Education, 378 F.2d 275 (4 Cir. 1967).