B. Lee ALLEN et al., Appellants,

v.

The ASHEVILLE CITY BOARD OF EDUCATION, a public body corporate, Appellee.

No. 14497.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 16, 1970.

Decided Nov. 2, 1970.

---

James E. Ferguson, II, Charlotte, N. C. (J. LeVonne Chambers, and Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., Robert Harrell, Ruben J. Dailey, Asheville, N. C., Conrad O. Pearson, Durham, N. C., Jack Greenberg and James M. Nabrit, III, New York City, on brief), for appellants.

William C. Morris, Jr., Asheville, N. C. (Williams, Morris & Golding, Asheville, N. C., on brief), for appellee.

Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge:

This is another school case, but a distinctive one. In Asheville, North Carolina, there are neither black schools nor white schools, just schools. Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The Asheville City Board of Education operates 12 schools, the characteristics of which are set out in the margin.[1] According to the Chairman of the Board, the purpose of the school board's plan, approved by the district court, was to "eliminate the all-white school" and to "eliminate all segregated schools and to balance the racial mix as nearly as possible." That the purpose has been fully achieved is obvious from an examination of the racial characteristics of each school set out below. The population ratio throughout the school system is 30 percent black and 70 percent white.

In Chambers v. Iredell County Board of Education, 9 Cir., 423 F.2d 613 (1970), we expressed doubt "that many school systems have achieved a higher degree of integration than presently prevails in Iredell County." Asheville tops Iredell. Doubtless Asheville is at or near the pinnacle of arithmetical desegregation in America.

I.

We do not yet know to what extent the inferior federal courts must examine the minutiae of integration in the schools. After the Supreme Court established "the fundamental principle that racial discrimination in public education is unconstitutional * * *", Brown v. Board of Education of Topeka, 349 U.S.

---

1. 1. Asheville High School—All students in 10th, 11th, and 12th grades.
2. South French Broad High School—All students in 9th grade.
3. Hall Fletcher Jr. High School—All students in 7th and 8th grades from west side of French Broad River plus Livingston Street attendance zone. 28% black, 72% white (App. 432a)
4. David Millard Jr. High School—All students in 7th and 8th grades from east side of French Broad River less Livingston Street attendance zone. 33% black, 67% white (App. 432a)
5. Hill Street School—All students within jurisdiction of defendant attending 6th grade with the exception of Newton School attendance zone.
6. Aycock School—Grades 1–5. 29% black, 71% white (App. 440a)
7. Claxton School—Grades 1–5. 22% black, 78% white (App. 435a)
8. Jones School—Grades 1–5. 22% black, 78% white (App. 434a)
9. Newton School—Grades 1–6. 37% black, 63% white (App. 433a)
10. Randolph School—Grades 1–5. 67% black, 33% white (App. 435a)
11. Rankin School—Grades 1–5. 26% black, 74% white (App. 440a)
12. Vance School—Grades 1–5. 21% black, 79% white (App. 440a)

294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the Court was silent for some eight years with respect to the application of the principle.[2] In Goss v. Board of Education of Knoxville, Tennessee, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632 (1963), the Court destroyed the minority to majority transfer privilege which had served as an escape hatch for the few white students who had been assigned to predominantly Negro schools. One year later the Court in Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), nullified the tuition grant scheme for frustrating school desegregation, and a year later in Bradley v. School Board of City of Richmond, Virginia, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965), the Court indicated that integration of teaching staffs is an essential step in the abolition of a dual school system. No other pronouncements were forthcoming from the Court for another three-year period until a trilogy of decisions announced in 1968 undertook to define "the thrust of *Brown II*" in light of contemporary circumstances. Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Board of Education of Gould School District, Arkansas, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners of Jackson, Tennessee, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). It was held that "[s]chool boards * * * operating state-compelled dual systems were * * * clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 437, 438, 88 S.Ct. 1689 (1968). Mere adoption of a freedom of choice plan of operation was ruled to be insufficient to meet this af-

firmative duty; rather, the school boards must "come forward with a plan that promises realistically to work, and promises realistically to work *now*," *Id.* at 439, 88 S.Ct. at 1694, meaning, apparently, that it must "work" by producing substantially integrated student bodies, faculties and programs in the schools. Although the Court rejected freedom of choice programs in all three of the school systems involved in the cases, the Court did not hold that choice plans are unconstitutional per se, but rather that such a plan is not acceptable if it has failed to eliminate the dual school system in fact, and if "there are reasonably available other ways * * * promising speedier and more effective conversion to a unitary, non-racial school system, * * * *" *Id.* at 441, 88 S.Ct. at 1696.

The last word spoken by the Court is that in Northcross v. Board of Education of Memphis, Tennessee City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970). In a concurring opinion the Chief Justice stated that a unitary school system had been defined by the Court to be "one 'within which no person is to be effectively excluded from any school because of race or color'", citing Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). If that is the definition then the phrase in Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689 (1968), "without a 'white' school and a 'Negro' school, but just schools" would appear to be exhortation.

With this background, it is plain to see that the Asheville City School Board has gone further down the road toward desegregation than any school board has ever been compelled to go, and probably much further than could be required. Although no one can say with any degree of certainty that there may not be some all-black and/or all-white schools within a unitary system, the Asheville Board

---

2. The only "school case" decided by the Court during the eight-year-period was Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), which added nothing to the general principle, but was instead directed against state power attempting to nullify it.

has chosen that there be none. Although no one can say with certainty that any particular racial balance must be achieved, the Asheville Board has chosen parity. The questions characterized by the Chief Justice in *Memphis* as being unresolved have been answered by the Asheville City School Board favorably to integration.[3]

## II.

Able counsel for plaintiffs are unable to fault the Board's plan other than a complaint with respect to the closing of two previously all-black schools and the impact of their closing, in the context of the rest of the plan, upon black students. For purposes of analysis plaintiffs formulate this complaint as presenting two questions to the Court, the first of which is whether the district court erred in approving the invidious selection of two all-black schools for closing.

We reject plaintiffs' contention that the school board has unfairly discriminated against black children in the selection of schools to be closed and that the district court should have compelled the closing of different schools in order to achieve the principle of *Brown II.*

In the first place, we think the mechanics of integration, where the purpose is obviously to implement the *Brown II* principle and effectively achieves that end, is ordinarily a matter within the discretion of school administrators. The question is not whether we might have selected different schools for extinction, nor even whether substantial evidence supports the Board's deci-

sion, but is instead whether the Board's decision is so plainly unfair that it clearly amounts to invidious discrimination in violation of the equal protection clause.

We are unable to perceive any invidious discrimination in the Board's plan. All students, black and white, attend one high school. All students, black and white, attend one 9th grade school. All students, black and white, attend two 7th and 8th grade schools, located on each side of the French Broad River, and without significant difference in racial balance. All students, black and white, attend one sixth grade school, with the insignificant exception of Newton School which continues to embrace the 6th grade and is itself in substantial racial balance.

South French Broad High School and Hill Street School were formerly all-black schools and are now being attended by all students, black and white, in the 9th and 6th grades respectively, except for the Newton School students previously noted. The white students coming to these formerly all-black schools have as far to travel as do the black pupils who now attend formerly all-white schools.

In order to accomplish racial balance the school board decided that it was necessary to close three schools, Livingston Street and Herring, formerly all-black, and Newton Elementary School, formerly all-white. After plaintiffs objected to the proposed plan on the basis of the closing of the two all-black schools and the failure to provide transportation,[4] the Board modified the plan on December 29, 1969, to provide for the continued operation of the Newton Ele-

---

3. In Northcross v. Board of Education of the Memphis, Tenn. City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (March 9, 1970), the Chief Justice in a concurring opinion wrote:

   "as soon as possible, however, we ought to resolve some of the basic practical problems when they are appropriately presented including whether, as a constitutional matter, any particular racial balance must be achieved in the schools; to what extent school districts and

zones may or must be altered as a constitutional matter; to what extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court."

4. The question of school bus transportation within the school system is now mooted, and all children residing more than one and one-half miles from school are provided free bus transportation. *See,* Sparrow v. Gill, 304 F.Supp. 86 (M.D.N.C. 1969).

mentary School with the two black schools remaining closed.

The Board says that the criteria used by it for determining which schools to use and which to close were (a) achievement of racial balance; (b) elimination of excess classrooms; (c) the size and accessibility of the schools involved; and (d) the amount of surrounding acreage. Plaintiffs insist, however, that the school board's true reason for selection is undisclosed and is simply its "reluctance to send primary grade white children into traditionally all-black schools located in all-black neighborhoods."

The motivation of individual members of a governing entity is not the same as administrative intent. Members may vote a good measure for bad reasons and vice versa. Plaintiffs' contention is pure speculation. We find nothing in the record to support it. The district judge did not so find nor was he requested to do so. Areas of any city, black or white in complexion, may be undesirable places for congregating children for reasons having nothing to do with race. Regardless of motivation, the school board's overriding intent was to achieve a unitary school system. It should not be thwarted by mere conjecture that some or even a majority of its members may have entertained unpleasant thoughts about placing white children in a black neighborhood.

It is true that more black *elementary* pupils than white will be required to ride reasonable distances in free public school buses in order to enter and become integrated in formerly white schools, but it is equally true that more white pupils than black in the higher grades will be required to ride to schools generally located close to the areas of black residents and away from the white residential pattern. Moreover, the situation of which plaintiffs complain cannot possibly be changed except at the cost of increasing the transportation of pupils approximately 40 percent. This is so because if the two black schools that have been closed were reopened, 70 percent of the black students formerly in each school would have to be moved out into other schools and this 70 percent replaced by white students.

We reiterate that there is nothing in the record that substantiates the charge of invidious discrimination against Negroes. Under the Board's plan that is now effectively operating, 60 percent of the students in the entire system are attending schools located in areas of the city that are 80 to 85 percent black in housing pattern. Six of the 12 schools operated by the Board are located in or very close to predominately black residential areas. Relatively more blacks are located in close proximity to the schools they attend than whites.

■ It is urged upon us that even so, both schools that were closed are newer and physically better than most of the other schools retained. We agree that this is a relevant factor. But neither alone nor in context does it establish invidious discrimination. Such a factor is only one of many that enter into a school closing decision. We repeat that we do not sit to review state administrative decisions beyond the very limited reach of the Constitution.

We find the decisions relied upon by plaintiffs to be distinguishable or inapplicable. In Felder v. Harnett County Board of Education, 4 Cir., 409 F.2d 1070, 1074, we affirmed the district court's rejection of the school board's plan in part because "there was no explanation offered as to how the school board determined upon particular schools for extinction, nor did the closing plan disclose criteria for the assignment of students from the closed schools except for cryptic reference to bus routes." But our primary concern and the basis of decision was the complete failure of the school board to disestablish an entrenched dual school system in which only 4.3 percent of the black children were attending previously all-white schools. In short, in *Felder* there was not the slightest assurance of achieving a unitary plan and the selection of schools for closing was therefore suspect.

We are advertent to Brice v. Landis N.D.Cal., Aug. 8, 1969), 314 F.Supp. 974, which held on the peculiar facts of the case that the closing of a Negro school was invidiously discriminatory and subject to injunction. We think it means no more than that and agree there may be such a case, but think it is not this one. If it is read to imply that it is ordinarily for the district courts to determine which schools shall be closed rather than for the school board, we reject the proposition.

More in point, we think, is Chambers v. Iredell County Board of Education, 423 F.2d 613 (4th Cir. 1970), in which we sustained a decision of the district judge approving the closing of an all-black school and refusing to find that doing so amounted to invidious discrimination.

### III.

 Plaintiffs' second question is but a broader and more dramatic variation of the first one. We are asked to decide whether the district court, in approving the plan, unconstitutionally placed "the burden of desegregation" upon black pupils in the school system. It is urged upon us that the plan approved by the district court "places an unfair, racially discriminatory burden upon black children" in that black children in grades 1 through 5 who previously attended all-black Livingston and Herring Elementary Schools will be required to travel as much as five or six miles in order to attend previously all-white schools. This is said to be an unfair allocation of the "burden" of integration, and it is suggested that the Constitution requires that an equivalent number or proportion of white children in the same grades be required to travel an equivalent distance to enter schools outside their previous attendance zones.

We hold that such a pattern of assignment implemented by free school bus transportation does not violate the equal protection clause of the Fourteenth Amendment.

If achieving integration by free bus transportation for reasonable distances must now be characterized as a "burden" and if we also assume, without deciding, that this burden must be equally shared between the races, the school board's plan is nevertheless valid. The worst that can be said of the plan it that in grades 1 through 5 the burden falls disproportionately on black children, whereas in grades 6 through 12 it falls disproportionately upon white children. We have previously noted that proportionately more white children than black travel away from their residential areas to attend school and that six out of 12 schools are maintained in or in close proximity to the black residential areas of the city.

Affirmed.