Stella **HORTON** and The North Carolina Teachers Association, a corporation, et al., Plaintiffs,

v.

The **ORANGE COUNTY BOARD OF EDUCATION**, a public body corporate, Defendant.

No. C-140-D-69.

United States District Court, M. D. North Carolina, Durham Division.

July 2, 1971.

Conrad O. Pearson, Durham, N. C., J. LeVonne Chambers, of Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., and Jack Greenberg, James M. Nabritt, III, and Conrad K. Harper, New York City, for plaintiffs.

Lucius M. Cheshire, of Graham & Cheshire, Hillsborough, N. C., for defendant.

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND OPINION

EDWIN M. STANLEY, Chief Judge.

The plaintiff, Stella Horton, alleges that the defendant, Orange County Board of Education, terminated her employment as a school teacher at the close of the 1968–1969 school year because of her race, and without according her due process of law. Reinstatement in the same or comparable position is sought. The plaintiff further alleges that, pursuant to a plan for desegregating the public schools of Orange County, defendant discriminated against its black pupils by arbitrarily closing the all-black Cedar Grove Elementary School. Injunctive relief is sought against the refusal of the defendant to utilize the school.

The case was tried by the Court without a jury. At the conclusion of the trial the parties were given specified times within which to file requests for findings and conclusions, and briefs. After requests and briefs were filed, the parties appeared before the Court and orally argued their respective contentions.

After giving due consideration to the testimony offered by the parties, including exhibits, the requests and briefs filed, and argument of counsel, the Court now makes and files herein its findings of fact and conclusions of law, separately stated:

FINDINGS OF FACT

1. Jurisdiction is vested in this Court by 28 U.S.C. § 1343. The rights sought to be redressed are rights allegedly secured by the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution of the United States.

2. Plaintiff, Stella Horton, is a black citizen of the United States and of the State of North Carolina, and was employed by the Orange County Board of Education as a teacher for the school years 1967–1968 and 1968–1969.

3. Plaintiff, North Carolina Teachers Association, is a professional teachers association consisting primarily of black teachers, including black teachers in the Orange County School System. Among its purposes are the promotion of education and the improvement of the status of teachers, and particularly eliminating discrimination against black teachers engaged in public education. The remaining individual plaintiffs are black citizens residing in Orange County, North Carolina, and may be affected by the practices of the Orange County Board of Education. The action is brought on behalf of the individual plaintiffs and all others in the Orange County School System similarly situated. The action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure.

4. Plaintiffs seek to enjoin the defendant from employing, assigning and dismissing, or refusing to employ black teachers and professional school personnel on the basis of race or color, or on a basis which discriminates against, or deprives the plaintiff, Stella Horton, and others of her class, of due process and equal protection of the law. Plaintiff Horton further seeks an injunction ordering her reinstatement as a teacher in the same or comparable position. Additionally, the plaintiff seeks to enjoin the defendant from discriminating on the basis of race or color in the operation or administration of the Orange County public schools, or from arbitrarily closing and refusing to utilize a formerly all-black school in the desegregation of the Orange County School System.

5. Plaintiff Horton attended the public schools of Pittsboro, North Carolina, where she graduated from high school in 1962 as valedictorian of her graduating class. She attended St. Augustine's College at Raleigh, North Carolina, from 1962 through 1964 as a history and government major. She transferred from St. Augustine's to A & T State University at Greensboro, North Carolina, in 1964. While attending A & T State University, she majored in history and graduated Magna

Cum Laude in 1966. In her college years she was cited in "Who's Who in American Colleges and Universities," was a member of Alpha Kappa Mu, National Education Society, and a member of Sigma Rho Sigma, National Social Science Honorary Society. She did further study at the University of North Carolina at Chapel Hill, North Carolina, and the North Carolina Central University at Durham, North Carolina. She also did practice teaching in the Orange County public schools at Hillsborough, North Carolina, in the spring of 1966.

6. In September, 1966, plaintiff Horton was employed by the Orange County Board of Education as a History Social Studies teacher, and was assigned to the then all-black Central High School where she taught for two years. She encountered no difficulties with students, parents and teachers while at the predominantly black senior high school, and was regarded by her principal as a superior teacher.

7. Beginning with the 1968–1969 school year, grades 10, 11 and 12 of the formerly all-black Central High School were transferred to the Orange High School. The defendant's plan had initially been to transfer only grade 10, but all students at Central High School chose to go to Orange High School, and, consequently, all three grades were moved. All teachers teaching in those grades were similarly transferred to Orange High School. The defendant's plan had been adopted to bring about total integration of the public schools of Orange County. Said plan had been brought about as a result of several conferences with representatives of the Department of Health, Education, and Welfare, and the plan had been approved by said agency.

8. As a result of combining the two high schools, there was a certain amount of racial turmoil in the Orange High School during the 1968–1969 school year. Plaintiff Horton identified herself with the black students in seeking redress for alleged grievances at such school.

9. On October 7, 1968, a delegation of approximately nine white people met with the defendant Board and complained that plaintiff Horton was teaching communism in the schools. The Board instructed the superintendent to investigate the complaint to determine whether it had any substance. In following the instructions of the Board, the superintendent only asked the plaintiff Horton if she had taught that communism was a superior form of government, and upon her denial of the charge, he reported to the Board that there was insufficient evidence to discharge her. Following the report of the superintendent, the Board, by letter dated October 16, 1968, advised the plaintiff Horton that it found no substance in the complaint and reaffirmed its confidence in her as a teacher.

10. Subsequently, parents of students, both black and white, lodged several complaints against the plaintiff Horton during the school year of 1968–1969. On November 4, 1968, a delegation of white parents attended a School Board meeting to present complaints concerning the plaintiff Horton. Included in this group were Mr. Bob Haas and Mr. Roland Scott, both of whom were members of the School Board at the time the Board voted to terminate the contract of the plaintiff Horton. Mr. Haas made the motion to terminate the plaintiff's contract and both Haas and Scott voted in favor of the motion. During the school year 1968–1969, there were 67 black teachers in the Orange County School System, and no complaints were received against any other black teacher in the system.

11. Pursuant to N.C.G.S. § 115–142, the validity of which is not challenged in this suit, the plaintiff's contract with the Orange County Board of Education was a continuing one unless terminated by the Board of Education. On May 22, 1969, the Board met and, pursuant to the recommendation of Mr. Fred Claytor, Principal of Orange High School, voted to terminate plaintiff's contract of

employment as of the end of the 1968–1969 school year. The reasons given to the Board by Mr. Claytor for recommending the termination of plaintiff Horton's contract were:

(a) Miss Horton was attempting to undermine the Principal's position, and cause distrust of the Principal among other black teachers, in that said plaintiff had reported that a student, one Danny Spells, had cursed her and that the Principal, contrary to her wishes, had refused to expel the student.

(b) That Miss Horton had humiliated several students by telling them that they "stunk".

(c) The plaintiff had frightened a student, one Sharon Shuford, who was seeking to become enrolled in her class.

(d) The plaintiff had required each of her students to purchase and read *Manchild in the Promised Land,* by Claude Brown, and *The Jungle,* by Upton Sinclair, and file a written report on these books or receive a failing grade for the six weeks' period.

At the time the book episode occurred, the policy regarding fees and solicitations in the Orange County schools was that school personnel could not engage in any buying or selling, except as allowed by the Board's policies, and that no fees, charges or costs could be collected from students without first obtaining approval of the Board of Education. This policy appeared in the Orange County Teachers' Handbook for the school year 1968–1969. Miss Horton possessed a copy of this handbook and had read this policy before distributing these books.

12. Mr. Claytor received numerous complaints from parents of students who had been required to purchase these books, especially in relation to the language contained in the book, *Manchild in the Promised Land.* Upon discovering that the plaintiff Horton had required her students to purchase these books, Mr. Claytor conferred with her and instructed her that she must return the monies

received from the students and require the students to return the books.

13. In spite of these instructions the plaintiff Horton did not take up all of these books, and when some students refused to return their books she failed to take any disciplinary action. She also allowed one student, Roger Daye, to take the books which had been returned and in her presence resell these books to students desiring to repurchase them. Daye then handed the monies received for these books over to the plaintiff Horton.

14. Mr. Claytor did not know that the plaintiff had been allowing Roger Daye to sell these books in her classroom when he informed her that he would not recommend her for re-employment for the following school year of 1969–1970. However, the Board of Education had been so informed of this incident as well as the other incidents when they met in May of 1969, and consequently made their decision not to rehire the plaintiff.

15. The book, *Manchild in the Promised Land,* is listed as permissible reading for high school students in *The Negro in American History, A Supplement to United States History, 11th Grade, N. C. Public Schools.* The book is Publication 420 of the North Carolina Department of Public Instruction.

16. The plaintiff Horton was familiar with the contents of the book, *Manchild in the Promised Land,* having read the same before requiring her students to read it.

17. The defendant Board at the time it made its decision not to re-employ Miss Horton knew that she had been guilty of gross insubordination in that she had deliberately defied the Board's direct instruction to her that she should refund to her students the monies she had collected from them for the purchase of *Manchild in the Promised Land.*

18. At the close of the 1968–1969 school year, Mr. Claytor recommended the termination of three teachers' contracts. One of these was the plaintiff

Horton, while the other two teachers were white. At the end of the 1968–1969 school year, a total of thirteen teachers did not return for the following year. Of these thirteen, two were black.

19. After being notified that her contract would be terminated for the following year, the plaintiff requested a hearing before the Board for the purpose of contesting the termination of her contract. Such a hearing was held on June 23, 1969. At said hearing the attorney for the School Board informed the plaintiff that there were no charges against her, whereupon plaintiff and her attorney refused to proceed any further and thereafter left the meeting.

20. Miss Horton was replaced in the Social Studies Department of Orange High School by another black teacher, Mr. Kenneth Harrell; and a white teacher, Mrs. Leonard, was hired to replace Miss Horton as a teacher of two United States History classes.

21. For the 1968–1969 school year, the defendant operated all of its schools with the exception of the Orange High School on a freedom of choice basis. The high schools were combined by transferring Grades 10, 11 and 12 from the formerly all black Central High School to the formerly all white Orange High School. A total of 241 black children chose to attend formerly all white schools, while five white children attended formerly all black schools.

22. Prior to the 1965–1966 school year, the following schools were all white: Aycock, Cameron Park, Efland, West Hillsborough, Orange Junior High School, and Orange High School. The following schools were all black: Cedar Grove, Efland-Cheeks, Central Elementary, and Central High School.

23. At the close of the 1968–1969 school year, the defendant closed the Cedar Grove School, Aycock School, and West Hillsborough School. Aycock School was located approximately two miles from Cedar Grove School. Aycock School was built around 1927, while West Hillsborough School was built in

1934 and the Efland School in the 1920's. Cedar Grove School was built around 1951.

24. The criteria which the Board of Education used in closing these schools was to accomplish complete integration. Its plans for accomplishing complete integration, which included the closing of the Cedar Grove School, were approved by the Department of Health, Education, and Welfare.

25. Of the schools now being used by the Orange County Board of Education, only two are older than Cedar Grove.

26. During the 1967–1968 school year, the defendant employed 75 black teachers and 134 white teachers, while during the 1969–1970 school year the defendant employed 68 black teachers and 149 white teachers. During the 1970–1971 school year there were 70 black teachers in the Orange County School System as compared to 149 white teachers, which represents a ratio of 32% black and 68% white. There are presently seven principals in the Orange County School System and three of these are black.

27. All the schools in Orange County have been completely desegregated, and the plaintiffs do not contend otherwise. So far as the record discloses, all the black teachers who desired to teach, or could be recruited to fill vacancies, except the plaintiff Horton, are still employed by the Orange County Administrative Unit. Consequently, the only issues submitted for consideration are the failure of the defendant to renew Miss Horton's contract, and the action of the Board in closing Cedar Grove School.

## DISCUSSION

There are State statutes governing the dismissal of public school teachers, the validity of which are not challenged by the plaintiff.

With reference to the termination of teachers' contracts at the end of a school year, N.C.G.S. § 115–142(b) provides:

"All contracts now or hereafter entered into between a county or city

board of education and a teacher, principal, or other professional employee shall continue from year to year unless terminated as hereinafter set forth. When it shall have been determined by a county or city board of education that an employee is not to be retained for the next succeeding school year it shall be the duty of the county or city superintendent to notify the employee, by registered letter deposited in mails addressed to last known address or business address of employee prior to the close of the school year, of the termination of his contract. When it shall have been determined that the services of an employee are not acceptable for the remainder of a current school year, and that the employee should be dismissed and relieved of his position immediately, the provisions and procedures of G.S. 115–67 and G.S. 115–145 shall be applicable."

Section 115–67 and Section 115–145 deal with the dismissal of teachers by the Board of Education during the school year. Under these sections no teacher shall be dismissed until charges have been filed in writing in the office of the superintendent and the teacher is given at least five days' notice of a hearing before the Board. Provisions are made for a full and fair hearing, and for the right of any suspended teacher to appeal to the courts.

It will be observed that school authorities are not required to grant a hearing or to prefer charges in cases where the teacher is not recommended for employment in the school system for the following year, although such procedures are available to a teacher dismissed during the school year.

■■ It is clearly established in this Circuit that there is no vested right to public employment so long as the termination of a contract is "not in retribution for an exercise of some constitutionally protected right." Brown v. Hirst, 443 F.2d 899 (4th Cir. 1971); Hodgin v. Noland, 435 F.2d 859 (4th

Cir. 1970). While the school board has discretion in deciding whether to continue the employment of a teacher, discretion means the exercise of judgment, not bias or capriciousness. Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966), and Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed. 2d 285 (1961). Thus, it must be determined whether or not the School Board acted arbitrarily or capriciously in refusing to re-employ plaintiff Horton for the 1969–1970 school year.

■ Miss Horton's testimony clearly established that she brought a can of Right Guard deodorant to class and made it available to all students who desired to use it. It is inconceivable that a public school teacher would make such a use of a toilet article. If the incident was intended as a joke, Miss Horton had a rather crude sense of humor to say the least.

The most serious incident, however, concerned the selling of books to students. Miss Horton had been instructed by her principal to collect from her students the sold copies of *Manchild in the Promised Land* and *The Jungle* and return their money to them. She not only failed to take any action if the students refused to return the books, but also handed over to a student, Roger Daye, the books that had been returned, and allowed him to resell the books to the students in her presence. She then accepted the proceeds of the sales from Roger Daye. This is nothing short of a deliberate refusal on the part of Miss Horton to carry out the lawful instructions of her principal. Miss Horton admitted having read the provisions in the Teachers' Handbook prohibiting the sale of any material to students without the approval of the School Board. At the time the Board declined to re-employ her for the 1969–1970 school year they were aware of her action in allowing Roger Daye to resell the books and turn the monies back over to her. In view of all the evidence before the Court, including the exhibits, it cannot be said that the School Board acted arbitrarily or capri-

ciously in failing to re-employ the plaintiff Horton for the 1969–1970 school year, or that it abused its discretion in this regard. Clearly the race of Miss Horton was not the reason for her dismissal. Race only serves to cloud the issue. The record clearly indicates that she not only dealt harshly with the children under her authority, but was also boisterous in manner and speech. In a learning situation, these qualities can be very disruptive. The manner in which she dealt with the Shuford child, the episode with respect to the can of deodorant, and her defiant attitude in the sale of the book, *Manchild in the Promised Land,* reveal not only her temperament for teaching but her attitude toward her pupils and her superiors.

■ Neither have the plaintiffs established that the defendant Board has engaged in policies and practices in hiring, assigning and terminating contracts of teachers and school personnel which are racially discriminatory. When there is a sudden, disproportionate decimation in the ranks of Negro teachers, an inference of discrimination is raised. Wall v. Stanly County Board of Education, 259 F.Supp. 238 (M.D.N.C.1966); Chambers v. Hendersonville City Board of Education, 364 F.2d 189 (4th Cir. 1966). But this is not the case here. During the 1967–1968 school year, the defendant Board employed 75 black teachers and 134 white teachers. During the school year 1969–1970, 68 black teachers and 149 white teachers were employed. Thus, there was a loss of seven black teachers and a gain of 15 white teachers over this two-year period. There were still 149 white teachers and 70 black teachers during the 1970–1971 school year. At the close of the 1968–1969 school year, the principal recommended the termination of three teachers' contracts, two white and one black. At the commencement of the following year, a total of 13 teachers did not return. Of these, 11 were white and two were black. There are presently 70 black teachers and 149 white teachers, or 32% black and 68% white, in the school system. The ratio of white teachers to black teachers in 1968–1969, when the School Board failed to re-employ the plaintiff Horton, was 64%–36%. Except for the minor variations in the ratio of white to black teachers, the record is barren of any practices or policies in hiring, assigning and terminating teachers' contracts on a racially discriminatory basis. So far as the record discloses, the defendant Board has employed every qualified black teacher and other school personnel who have applied for employment.

■ Finally, the plaintiffs contend that the closing of the all black Cedar Grove Elementary School was arbitrary and racially discriminatory. The defendant's plan for total integration of the Orange County Public Schools, which includes the closing of the Cedar Grove School, was approved by the Department of Health, Education, and Welfare. In Allen v. The Asheville City Board of Education, 434 F.2d 902 (4th Cir. 1970), the plaintiff challenged the closing of two all-black schools by the Asheville School Board in an attempt to fully integrate its schools. In upholding the closing of the two schools, the Court stated:

> "The question is not whether we might have selected different schools for extinction, nor even whether substantial evidence supports the Board's decision, but is instead whether the Board's decision is so plainly unfair that it clearly amounts to invidious discrimination in violation of the equal protection clause. (At p. 905)

> \*　　\*　　\*　　\*　　\*　　\*

> "It is urged upon us that even so, both schools that were closed are newer and physically better than most of the other schools retained. We agree that this is a relevant factor. But neither alone nor in context does it establish invidious discrimination. Such a factor is only one of many that enter into a school closing decision. We repeat that we do not sit to review state administrative decisions beyond

the very limited reach of the Constitution. (At p. 906)

\* \* \* \* \* \*

"If it is read to imply that it is ordinarily for the district courts to determine which schools shall be closed rather than for the school board, we reject the proposition." (At p. 907)

This case is factually indistinguishable from the *Allen* case. There has been no credible evidence whatever that the Board's decision to close Cedar Grove School was so plainly unfair that it amounted to invidious discrimination. Commendably, Orange County has met its responsibility to completely desegregate its school system. The plaintiffs take no exception whatever to the integration plan now in effect, except with the decision of the Board to close the Cedar Grove School. The plan for desegregating the school system, including the closing of the Cedar Grove School, was carried out with the assistance of the Department of Health, Education, and Welfare.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter.

2. The defendant's action in not renewing the contract of the plaintiff Horton was neither arbitrary nor capricious, and was not racially motivated.

3. The defendant's practices and policies in hiring, assigning and terminating contracts of black teachers and other school personnel have not been shown to be racially discriminatory.

4. The defendant's decision to close the Cedar Grove School was based solely upon lawful efforts of the defendant Board to accomplish a racially integrated school system, and was not racially discriminatory.

A judgment will be entered accordingly.